No. 24-2286

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
_____

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
    Plaintiff-Appellee,

v.

DRIVERS MANAGEMENT, LLC and WERNER ENTERPRISES, INC.,
    Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Nebraska
Hon. John M. Gerrard, Senior District Judge
Case No. 8:18-cv-00462
_____

RESPONSIVE BRIEF OF THE EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION AS PLAINTIFF-APPELLEE
_____

KARLA GILBRIDE
General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

DARA S. SMITH
Assistant General Counsel

GAIL S. COLEMAN
Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(202) 921-2920
gail.coleman@eeoc.gov

## SUMMARY OF THE CASE

Victor Robinson, who is deaf, always wanted to be a commercial truck driver. He satisfied the federal physical-qualification standards for commercial truck drivers, graduated from truck-driving school, and obtained a commercial license. Werner refused to hire him because, it said, it could not safely train a deaf driver. The EEOC brought this suit for discrimination under the Americans with Disabilities Act.

At trial, two expert witnesses testified about numerous accommodations that would have enabled Robinson to train safely, none of which would have required him to take his eyes off the road any longer than would be necessary to check a rear-view mirror. Representatives from five of Werner's competitors testified that their companies have successfully used these accommodations to train deaf drivers.

The district court held that, based on Werner's own explanation, Werner did not hire Robinson because he was deaf. The jury found him qualified and rejected Werner's business-necessity defense. It awarded $36,075,000 in compensatory and punitive damages (reduced to $300,000 to comply with the statutory cap). The court also ordered backpay and injunctive relief. Werner appealed. Oral argument is unnecessary.

i

# TABLE OF CONTENTS

Summary of the Case............................................................................. i

Table of Contents ............................................................................... ii

Table of Authorities ............................................................................ v

Statement of Jurisdiction...................................................................1

Statement of the Issues .....................................................................1

Statement of the Case .......................................................................6

    I.      Statement of Facts...............................................................6

          A.      Robinson applied to Werner for his "dream job" of
                driving a commercial truck.........................................6

          B.      Werner rejected Robinson, asserting that it could not
                train him because he is deaf.........................................8

          C.      Other trucking companies have successfully trained
                inexperienced deaf drivers by using a variety of
                reasonable accommodations.......................................12

          D.      Werner asserted that no reasonable accommodation
                would have worked for its training program, which it
                characterized as unique.............................................18

    II.     District Court Proceedings................................................19

Summary of Argument .....................................................................23

Argument .........................................................................................26

    I.      The district court correctly directed a verdict on causation
          because, by Werner's own account, Werner did not hire
          Robinson because he is deaf.............................................26

Appellate Case: 24-2286    Page: 3    Date Filed: 11/15/2024 Entry ID: 5457236

II.    The district court correctly dismissed Werner's affirmative defenses of undue hardship and direct threat because Werner showed no genuine issues of material fact, and, even if the court did err, any error was harmless. ...............................................31

    A.    Undue Hardship.............................................................31

    B.    Direct Threat ................................................................36

III.   The district court acted within its discretion when making evidentiary rulings. ..................................................................38

    A.    Standard of Review.......................................................38

    B.    Discussion.....................................................................39

        1.    The court reasonably admitted relevant evidence that Werner recruiters and managers, including a manager who played a role in Robinson's rejection, were biased against deaf people....................................................... 39

        2.    The court reasonably admitted relevant evidence that other trucking companies have successfully accommodated deaf drivers..................................... 43

        3.    The court reasonably excluded irrelevant and unduly prejudicial evidence of Robinson's subsequent driving record........................................................................ 45

IV.    The district court correctly allowed the jury to consider punitive damages because trial evidence supported the conclusion that Werner acted with malice or reckless indifference to Robinson's rights.........................................................47

    A.    Standard of Review.......................................................47

    B.    Discussion.....................................................................47

Appellate Case: 24-2286    Page: 4    Date Filed: 11/15/2024 Entry ID: 5457236

V.      The district court acted within its discretion in ordering injunctive relief because, as of the time of judgment, Werner still refused to hire inexperienced deaf drivers who possessed an exemption from the federal hearing requirement.......................51

VI.     The district court correctly allowed the jury to determine whether Robinson was qualified because he satisfied federal physical-qualification standards and there was sufficient evidence from which the jury could find that he could perform all essential functions of the job..........................................54

        A.      Werner is incorrect that Robinson was unqualified as a matter of law. ...............................................................55

        B.      Sufficient evidence supports the jury's finding that Robinson was qualified. ...........................................57

                1.      Standard of Review .................................................. 57

                2.      Discussion.................................................................. 58

VII.    The district court acted within its discretion in awarding prejudgment interest, which is an indispensable element of make-whole relief. ...............................................................61

VIII.   It is premature for this Court to rule on jury instructions for a hypothetical second trial. ....................................................65

Conclusion.............................................................................66

Certificate of Compliance

Certificate That Brief is Virus-Free

Certificate of Service

Appellate Case: 24-2286     Page: 5     Date Filed: 11/15/2024 Entry ID: 5457236

# TABLE OF AUTHORITIES

**Cases**

*Albemarle Paper Co. v. Moody*,
    422 U.S. 405 (1975).............................................................................51

*Albertson's, Inc. v. Kirkingburg*,
    527 U.S. 555 (1999)......................................................................55-56

*Anderson v. KAR Glob.*,
    78 F.4th 1031 (8th Cir. 2023)...........................................................26

*Armstrong v. Burdette Tomlin Mem'l Hosp.*,
    438 F.3d 240 (3d Cir. 2006).............................................................36

*Beshears v. Asbill*,
    930 F.2d 1348 (8th Cir. 1991)..........................................................36

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020)..........................................................................31

*Briscoe v. Fred's Dollar Store, Inc.*,
    24 F.3d 1026 (8th Cir. 1994).............................................................52

*Brown v. City of Jacksonville*,
    711 F.3d 883 (8th Cir. 2013).............................................................26

*Buckles v. First Data Res., Inc.*,
    176 F.3d 1098 (8th Cir. 1999)......................................................32, 34

*Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*,
    439 F.3d 894 (8th Cir. 2006).............................................................48

*Chevron U.S.A., Inc. v. Echazabal*,
    536 U.S. 73 (2002)............................................................................21

v

*Christianson v. Poly-Am., Inc. Med. Ben. Plan*,
   412 F.3d 935 (8th Cir. 2005) ...............................................................63

*Cooper v. Gen. Am. Life Ins. Co.*,
   827 F.3d 729 (8th Cir. 2016) ...............................................................64

*Coterel v. Dorel Juv. Grp., Inc.*,
   827 F.3d 804 (8th Cir. 2016) ...............................................................39

*Dalal v. Alliant Techsys., Inc.*,
   No. 94-1483, 1995 WL 747442 (10th Cir. Dec. 18, 1995) ...........................63

*Delcastillo v. Odyssey Res. Mgmt., Inc.*,
   292 F. App'x 519 (8th Cir. 2008) .........................................................63

*EEOC v. AutoZone, Inc.*,
   707 F.3d 824 (7th Cir. 2013) ...............................................................53

*EEOC v. Schneider Nat'l, Inc.*,
   481 F.3d 507 (7th Cir. 2007) ..........................................................44-45

*EEOC v. Siouxland Oral Maxillofacial Surgery Assocs., L.L.P.*,
   578 F.3d 921 (8th Cir. 2009) ...............................................................48

*Fisher v. Pharmacia & Upjohn*,
   225 F.3d 915 (8th Cir. 2000) ...............................................................40

*Heaton v. Weitz Co., Inc.*,
   534 F.3d 882 (8th Cir. 2008) ...............................................................42

*Huber v. Westar Foods, Inc.*,
   No. 23-1087, 2024 WL 3892871 (8th Cir. Aug. 21, 2024) ...........................29

*Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir. 1997).................................65

*Kolstad v. Am. Dental Ass'n*,
   527 U.S. 526 (1999) ....................................................................48, 49

Appellate Case: 24-2286    Page: 7    Date Filed: 11/15/2024 Entry ID: 5457236

*Leonard v. Sw. Bell Corp. Disability Income Plan,*
    408 F.3d 528 (8th Cir. 2005) ........................................................ 61-63

*Life Plus Int'l v. Brown,*
    317 F.3d 799 (8th Cir. 2003) ............................................ 39, 41, 46

*Matthews v. Commw. Edison Co.,*
    128 F.3d 1194 (7th Cir. 1997) ........................................................ 29-30

*Mole v. Buckhorn Rubber Prods., Inc.,*
    165 F.3d 1212 (8th Cir. 1999) ........................................................30

*Nall v. BNSF Ry. Co.,*
    917 F.3d 335 (5th Cir. 2019) ........................................................29

*Rathborne Land Co., L.L.C. v. Ascent Energy, Inc.,*
    610 F.3d 249 (5th Cir. 2010) ........................................................62

*Reach Cos., LLC v. Newsert, LLC,*
    94 F.4th 712 (8th Cir. 2024) ........................................................6

*RK Co. v. See,*
    622 F.3d 846 (7th Cir. 2010) ........................................................ 62, 63

*Rocket Jewelry Box, Inc. v. Quality Int'l Packaging, Ltd.,*
    90 F. App'x 543 (Fed. Cir. 2004) ........................................................63

*Ryther v. KARE 11,*
    108 F.3d 832 (8th Cir. 1997) (en banc).................................57-58, 60

*Salitros v. Chrysler Corp.,*
    306 F.3d 562 (8th Cir. 2002) ........................................................47

*Sanders v. Union Pac. R.R. Co.,*
    108 F. 4th 1055 (8th Cir. 2024) ........................................................28

*Se. Cmty. Coll. v. Davis,*
    442 U.S. 397 (1979) ........................................................34-35

Appellate Case: 24-2286    Page: 8    Date Filed: 11/15/2024 Entry ID: 5457236

*Skerski v. Time Warner Cable Co.*,
    257 F.3d 273 (3d Cir. 2001) ...................................................................58

*Sprint/United Mgmt. Co. v. Mendelsohn*,
    552 U.S. 379 (2008) ............................................................... 38, 42

*Taylor v. Jones*,
    653 F.2d 1193 (8th Cir. 1981) ...........................................................52

*Townsend v. Bayer Corp.*,
    774 F.3d 446 (8th Cir. 2014) ....................................................... 39, 47

*United States v. Musk*,
    719 F.3d 962 (8th Cir. 2013) ...........................................................41

*United States v. Rupp*,
    68 F.4th 1075 (8th Cir. 2023) ....................................................... 47, 50

*West Virginia v. United States*,
    479 U.S. 305 (1987) ...........................................................62

*Wilson v. Muckala*,
    303 F.3d 1207 (10th Cir. 2002) ...........................................................61

*Winbush v. Iowa*,
    66 F.3d 1471 (8th Cir. 1995) ...........................................................61

**Statutes**

Americans with Disabilities Act of 1990,
    42 U.S.C. § 12101 *et seq* ...........................................................19

      § 12111(3) ...........................................................36

      § 12111(8) ...........................................................54

      § 12111(10) ...........................................................32

      § 12112(a) ....................................................... 26, 30, 54

Appellate Case: 24-2286   Page: 9   Date Filed: 11/15/2024 Entry ID: 5457236

§ 12112(b)(5)(A) ........................................................ 31, 33, 36

§ 12113(b) .................................................................36

§ 12116 .....................................................................37

§ 12117(a) .............................................................. 51, 61

§ 12132 .....................................................................33

Civil Rights Act of 1991,
42 U.S.C. § 1981a .............................................. 22, 43, 47

Employee Retirement Income Security Act of 1974,
29 U.S.C. § 1132(a) ..................................................63

Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e-5(g)(1) .........................................51

## Regulations

29 C.F.R. § 1630.15(b) ....................................................44

29 C.F.R. § 1630.2(m) .....................................................54

29 C.F.R. § 1630.2(r) ......................................................37

49 C.F.R. § 391.41 ....................................................... 6, 56-57

## Rules

Fed. R. Civ. P. 54(c) ................................................... 62, 65

Fed. R. Evid. 401 ..........................................................45

Fed. R. Evid. 402 ..........................................................38

Fed. R. Evid. 403 ..........................................................38

Appellate Case: 24-2286    Page: 10    Date Filed: 11/15/2024 Entry ID: 5457236

**Other Authorities**

Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. pt. 1630, app. § 1630.2(p) .................................................32

Qualification of Drivers; Application for Exemptions; Nat'l Ass'n of the Deaf, 78 Fed. Reg. 7479-01 (Fed. Motor Carrier Safety Admin. Feb. 1, 2013) (notice of final disposition)................................................. 6-7

x

## STATEMENT OF JURISDICTION

The Equal Employment Opportunity Commission ("EEOC") agrees with Werner's jurisdictional statement.

## STATEMENT OF THE ISSUES

1. Did the district court correctly direct a verdict on causation where, by Werner's own account, Werner did not hire Robinson because he is deaf?

   - *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020)

   - *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 349 (5th Cir. 2019) (Costa, J., specially concurring)

2. Undue Hardship:

   a. Did the district court correctly dismiss Werner's affirmative defense of undue hardship because Werner offered no evidence that training Robinson through non-verbal communication would have fundamentally altered the nature of its business?

   - 42 U.S.C. § 12112(b)(5)(A)

   - *Buckles v. First Data Res., Inc.*, 176 F.3d 1098 (8th Cir. 1999)

   - *Se. Cmty. Coll. v. Davis*, 442 U.S. 397 (1979)

1

b. If the district court erred by dismissing Werner's undue-hardship affirmative defense, was any such error harmless because the defense would simply have shifted the burden of proof from the EEOC to Werner regarding the necessity of verbal in-cab communication to assure safety?

- *Beshears v. Asbill*, 930 F.2d 1348 (8th Cir. 1991)

- *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240 (3d Cir. 2006)

3. Direct threat:

a. Did the district court correctly dismiss Werner's direct-threat affirmative defense because Werner failed to make the required individualized assessment of Robinson?

- 42 U.S.C. § 12113(b)

b. If the district court erred by dismissing Werner's direct-threat affirmative defense, was any such error harmless because the defense would simply have shifted the burden of proof from the EEOC to Werner regarding the necessity of verbal in-cab communication to assure safety?

- *Beshears v. Asbill*, 930 F.2d 1348 (8th Cir. 1991)

2

- *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240 (3d Cir. 2006)

4. Evidentiary Issues:

   a. Did the district court act within its discretion when admitting relevant evidence that (1) Werner recruiters and managers, including a manager who played a role in rejecting Robinson, were biased against deaf people, and (2) other trucking companies have successfully accommodated deaf drivers?

      - *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379 (2008)

      - *Life Plus Int'l v. Brown*, 317 F.3d 799 (8th Cir. 2003)

      - *Townsend v. Bayer Corp.*, 774 F.3d 446 (8th Cir. 2014)

   b. If the district court erred by admitting evidence of discriminatory remarks, was any such error harmless because there was ample other evidence upon which the jury could have based its award of punitive damages?

      - *Heaton v. Weitz Co., Inc.*, 534 F.3d 882 (8th Cir. 2008)

   c. Did the district court act within its discretion in excluding irrelevant and unduly prejudicial evidence of Robinson's subsequent driving record?

3

- *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379 (2008)

- *Life Plus Int'l v. Brown*, 317 F.3d 799 (8th Cir. 2003)

- *Townsend v. Bayer Corp.*, 774 F.3d 446 (8th Cir. 2014)

5. Did the district court correctly allow the jury to consider punitive damages because trial evidence supported the conclusion that Werner acted with malice or reckless indifference to Robinson's rights?

- *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999)

- *EEOC v. Siouxland Oral Maxillofacial Surgery Assocs., L.L.P.*, 578 F.3d 921 (8th Cir. 2009)

6. Did the district court act within its discretion in ordering injunctive relief because, as of the time of judgment, Werner still refused to hire inexperienced deaf drivers who possessed an exemption from the federal hearing requirement?

- *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)

- *Taylor v. Jones*, 653 F.2d 1193 (8th Cir. 1981)

- *EEOC v. AutoZone, Inc.*, 707 F.3d 824 (7th Cir. 2013)

4

7.  Did the district court correctly allow the jury to determine whether Robinson was qualified because he satisfied federal physical-qualification standards and there was sufficient evidence from which the jury could find that he could perform all essential functions of the job?

    - *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999), *superseded on other grounds*

    - *Ryther v. KARE 11*, 108 F.3d 832 (8th Cir. 1997) (en banc)

8.  Did the district court act within its discretion in awarding prejudgment interest because prejudgment interest is an indispensable element of make-whole relief, and courts must order all relief to which a party is entitled?

    - *Winbush v. Iowa*, 66 F.3d 1471 (8th Cir. 1995)

    - *West Virginia v. United States*, 479 U.S. 305 (1987)

    - *Leonard v. Sw. Bell Corp. Disability Income Plan*, 408 F.3d 528 (8th Cir. 2005)

9.  Is it premature for this Court to rule on a failure-to-accommodate jury instruction for a hypothetical second trial?

    - *Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir. 1997)

5

## STATEMENT OF THE CASE

### I.    Statement of Facts[1]

#### A. Robinson applied to Werner for his "dream job" of driving a commercial truck.

Victor Robinson, who has been deaf since birth, wanted since childhood to be a commercial truck driver like his stepfather and two of his uncles. TR.,Vol.2, pp. 330-32.[2] Federal regulations generally require commercial truck drivers to meet specific hearing requirements, *see* 49 C.F.R. § 391.41(b)(11), but the Federal Motor Carrier Safety Administration ("FMCSA") issues exemptions to individuals who are deaf or hard of hearing "if it finds 'such exemption would likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption.'" Qualification of Drivers; Application for Exemptions; Nat'l Ass'n of the Deaf, 78 Fed. Reg. 7479-01 § B (Fed. Motor

---

[1] Consistent with the standard of review of a jury verdict, we relate these facts in the light most favorable to the EEOC. *See Reach Cos., LLC v. Newsert, LLC*, 94 F.4th 712, 718 (8th Cir. 2024).

[2] Record references are as follows: the district court docket is designated "R.Doc.__"; the transcript is designated "TR.,Vol. __, p.__"; the Addendum to Werner's brief is designated "Add.__"; Appellant's Appendix is designated "App.__"; and the Appellee's Appendix is designated "Aple.App.___" Videos shown to the jury are designated "Aple.App.29, thumb drive, Ex.52,VideoClip__ at [time]."

6

Carrier Safety Admin. Feb. 1, 2013) (notice of final disposition) (citing 49 U.S.C. §§ 31136(e), 31315). To obtain an exemption, a deaf applicant must demonstrate a "safe driving history." *Id.* § C. Hearing applicants have no such requirement. TR.,Vol.1, p.158.

Robinson obtained an exemption and enrolled in Roadmaster Drivers School ("Roadmaster"), a federally certified, Werner-owned school that prepares individuals to obtain a Commercial Driver's License ("CDL"). TR.,Vol.2, p.331; TR.,Vol.4 p.827. Roadmaster's training consists of two weeks of classroom instruction, one week of driving on a private course, and one week of over-the-road driving. TR.,Vol.2, pp.401-02. Upon graduation, a student may obtain a CDL only by passing a road test with the Department of Motor Vehicles. TR.,Vol.1, p.159. Robinson successfully completed the Roadmaster program, passed his test with the Department of Motor Vehicles, and obtained his CDL. TR.,Vol.2, p.339.

Robinson applied to a number of companies, including Werner, for a truck-driving position. TR.,Vol.2, p.341. Robinson especially wanted to work for Werner because "[i]t was one of the first dream jobs that I had seen, those big blue trucks every day growing up." *Id.*

7

## B. Werner rejected Robinson, asserting that it could not train him because he is deaf.

After Robinson submitted his application, field recruiter David Stephany emailed the manager of student recruiting, Erin Marsh, and the recruiting manager, Jim Morbach, to let them know that Robinson was deaf. Aple.App.28, Ex.37 at 1. Marsh emailed Scott Hollenbeck, director of compliance, asking him "how to proceed." App.652, Ex.38. She told Stephany, meanwhile, that recruiter Morgan Baker already had Robinson's file, and that she would have Baker "get some additional information and follow up with you." App.650, Ex.35 at 1. Morbach told Stephany, "[W]e will go through our normal hiring process." Aple.App.28, Ex.37 at 1.

Werner spent more than one month considering Robinson's application. TR.,Vol.3, pp.515-16. During this time, Werner ran two criminal background checks and reviewed Robinson's motor vehicle report and employment history. TR.,Vol.3, pp.506, 511-13. The safety and legal departments also reviewed Robinson's application. TR.,Vol.3, pp.500, 516. While this investigation was ongoing, Roadmaster's placement director checked on the status of Robinson's application. App.646, Ex.33 at 2. Marsh

8

told her, "I do not have an update. I want to speak with [Hollenbeck] when he returns on Monday." App.645, Ex.33 at 1.

Given that Morbach had said Werner should proceed with the normal application process, Marsh emailed Robinson asking him to contact her "at your earliest convenience." App.653, Ex.39 at 1. Robinson called that day and they talked via a relay service[3] about Werner's orientation and simulator training. TR.,Vol.2, pp.352-53. Marsh emailed Robinson again later that afternoon, telling him that Werner had preapproved his application. App.617, Ex.16. This meant that he met the minimum qualifications for the over-the-road-driver position. TR.,Vol.3, p.515; App.596, Ex.1.

Werner Vice President of Safety Jaime Hamm testified that she researched the viability of potential accommodations for training deaf truck drivers, TR.,Vol.4, pp.808-12, but contrary evidence suggested that she did not. Although Hamm stated that she had contacted various organizations, including the American Trucking Association, the Commercial Vehicle Safety Alliance, the FMCSA, and the Nebraska

---

[3] The "relay service" allowed Robinson and Marsh to speak on the phone via an interpreter. TR.,Vol.4, pp.813-14.

Department of Transportation, she took no notes of these alleged conversations. TR.,Vol.4, pp.847-48. Lance Knapp, the investigator for the Nebraska Equal Opportunity Commission who spoke with Hamm after Robinson filed a discrimination charge, testified that he asked Hamm about her efforts to investigate potential accommodations and she specifically told him that she had done no research. TR.,Vol.4, pp.870-71, 877.

After Marsh and Hamm discussed Robinson's application, Marsh emailed Robinson asking him to call to speak with a safety representative. TR.,Vol.3, pp.524-25. When Robinson called, Marsh and Hamm introduced themselves and then Hamm spoke with Robinson. TR.,Vol.3, pp.567-68; TR.,Vol.4, pp.813-14. Marsh remained in the room listening. TR.,Vol.4, p.814.

Hamm asked Robinson about his ability to drive safely during Werner's training program, including his ability to hear emergency vehicles. TR.,Vol.4, pp.816-17. Robinson described accommodations that had worked for him at Roadmaster and explained that he could identify emergency vehicles visually. TR.,Vol.4, pp.815-17.

At the end of this call, Hamm told Robinson, "No, I'm sorry, we can't hire you because of your deafness," and hung up. TR., Vol.2, p.358.

10

Robinson called Marsh and Hamm back several times but did not get an answer. *Id.* He also emailed Baker, his Werner recruiter, to tell her, "Guess what. They won't hire me because I am deaf. So what [do] you suggest?" App.643, Ex.31 at 1. Baker did not respond either. TR.,Vol.2, p.358.

At trial, the jury saw emails and chats that Werner recruiters and managers wrote two years later suggesting that they were biased against deaf individuals in general, and deaf drivers in particular. App.629, Ex.23 at 12; App.637, Ex.25 at 7; App.640-41, Ex.26 at 1-2; Aple.App.14-15, Ex.24 at 3-4; Aple.App.18, Ex.27 at 3; Aple.App.22, Ex.29 at 4. On one occasion, fellow-manager Jen Williams told Marsh, "i'm on hold with a deaf guy…wtf…they must be trying to find him…you know yelling his name…but he can't hear them. i'm going to hell. marco. nobody can here [sic] polo. where is he?" App.629, Ex.23 at 12. Marsh responded, "lmao, omg." *Id.*

Senior Regional Manager/Field Recruiter Tom Pietrzak told Williams and Marsh about a deaf man who had considered applying to Werner but had secured a job elsewhere as a truck driver. App.641, Ex.26 at 2. Marsh said, "this scares me to death." *Id.* Pietrzak replied, "Huh? Sorry, couldn't resist. There is probably a special place for me somewhere someday."

11

App.640, Ex.26 at 1. Marsh said, "You were just waiting by your email so you could pounce on that one." *Id.*

Williams also asked Marsh if she had ever heard of a driving school called CDL Marco Polo. App.637, Ex.25 at 7. Marsh said that she had not and Williams responded, referencing their earlier joke, "hopefully they don't have a lot of deaf students." *Id.* She then said, "that was bad." *Id.* Marsh agreed, "so bad." *Id.*

Another time, Williams asked Marsh, "can i grab the deaf guy questions from you," adding, "marco…." Aple.App.14-15, Ex.24 at 3-4. Marsh did not tell her that the joke was inappropriate. *Id.*

Marsh's and Williams's supervisor testified that sometime after the EEOC sued, Werner's legal department disciplined them for their comments. TR.,Vol.3, p.651. The supervisor told Marsh and Williams that he was disappointed, but he did not place anything in their files. TR.,Vol.3, p.653.

### C. Other trucking companies have successfully trained inexperienced deaf drivers by using a variety of reasonable accommodations.

The EEOC's two expert witnesses, Don Olds (a professional truck-driving instructor) and Dr. Steven Arndt (a human-factors scientist),

12

testified to a number of reasonable accommodations that other trucking companies have used with success to train deaf drivers. Among the proven accommodations are hand signals, colored flags, flash cards, white boards, and American Sign Language to convey messages such as go left/go right/slow down/slow down faster/go straight; or pen and paper for more extensive communication before getting into the truck, after getting out, or while stopped at a safe location. TR.,Vol.1, pp.162, 169, 211-12; TR.,Vol.2, p.270. Roadmaster used some of these accommodations to train Robinson to pass his CDL test. TR.,Vol.2, p.338.

Arndt testified that using these methods is safe. TR.,Vol.2, p.252. Both experts said that deaf drivers can see signals in their peripheral vision, which, Arndt explained, is generally better than the peripheral vision of people who can hear. TR.,Vol.1, p.167; TR.,Vol.2, p.266. Taking one's eyes off the road to see the signals, Olds added, requires only a glance—no longer than a driver takes to check their mirrors, change a radio channel, use a CB radio, or check their surroundings. TR.,Vol.1, pp.166-67. In fact, Olds testified, he sometimes uses hand signals with hearing students because they are clearer than verbal instructions. TR.,Vol.1, p.174. He added that, unlike deaf drivers, hearing drivers can sometimes be

13

distracted by conversations. TR.,Vol.1, p.169. Likewise, Arndt testified that hearing drivers can be distracted by hands-free phone calls. TR.,Vol.2, p.269.

Olds also testified that it is unsafe for drivers to keep their eyes fixated on the road at all times because doing so can lead to "highway hypnosis," or can cause a driver to forget the last few miles of where they have been. TR.,Vol.1, p.168. "[Y]ou need to keep your eyes moving to stay alert," he said. *Id.*

Additionally, Olds testified, it is safe for a deaf driver to briefly take one hand off the wheel to communicate something to a trainer. TR.,Vol.1, p.170. All drivers sometimes take one hand off the wheel, he said—for instance, to get a drink; to shift gears; to change radio stations; to roll a window up or down; or to turn on headlights, a blinker, or windshield wipers. *Id.* The jury watched several video clips of a hearing Werner trainee taking one or both hands off the wheel while driving at highway speeds. *See* Aple.App.29, thumb drive, Ex.52,VideoClipGB150251 at 4:30-4:41, 5:27-5:43 (described at TR.,Vol.1, pp.198-200); Aple.App.29, thumb drive, Ex.52,VideoClipGB230251 at 0:14-0:32, 2:29-2:33, 3:05-3:30 (described at TR.,Vol.1, pp.200-03); Aple.App.29, thumb drive, Ex.52,VideoClipGB220251

14

at 4:00-4:38, 6:15-6:58 (described at TR.,Vol.1, p.206); Aple.App.29, thumb

drive, Ex.52,VideoClipGB050250 at 0:45-1:23 (described at TR,Vol.4, p.762).

The jury also watched video clips of the driver taking his eyes off the road

to look at what his trainer was showing him on the dashboard and to look

at his trainer while they were talking. Aple.App.29, thumb drive,

Ex.52,VideoClipGB150251 at 6:10-6:20 (described at TR., Vol.1, pp.198-200);

Aple.App.29, thumb drive, Ex.52,VideoClipGB010251 at 2:43-3:02

(described at TR.,Vol.1, p.207).

Olds testified that deaf students can handle emergencies as well as

hearing drivers. TR.,Vol.1, pp.209-10. Whether deaf or hearing, an

emergency might require a driver to pull over to a safe spot. TR.,Vol.1,

p.173. A trainer could communicate the need to do this, Olds said, by using

hand signals faster than usual. *Id.* For certain emergencies—such as a deer

in the road—Arndt testified, there would be no time to communicate

danger to any driver, whether deaf or hearing. TR.,Vol.2, p.303. Both Olds

and Arndt testified that deaf drivers may be able to detect an emergency

vehicle visually before a hearing driver can hear the siren. TR.,Vol.1, p.209;

TR.,Vol.2, p.249. Moreover, Werner hires experienced drivers who are deaf,

15

and who have the same need to identify emergency vehicles. TR.,Vol.4, p.741.

Witnesses from five other trucking companies testified that their companies have used reasonable accommodations to train inexperienced deaf student drivers, and that they have done so successfully. Lindsay Wilbert, Swift Transportation's director of human resources; Clarence Easterday, Western Express's executive advisor for risk management; Wayne Cederholm, C.R. England Transportation's vice president of driver recruiting and schools; Lathen Whited, Covenant Transport's vice president of operations; and Christopher Hilkemann, Crete Carrier Corp.'s vice president of risk management, testified that a deaf student driver and their instructor work out the method of communication that works best for them. TR.,Vol.2, pp.321, 440; TR.,Vol.3, pp.594-95; R.Doc.349-3 at 19; R.Doc.349-4 at 10, 12-14; R.Doc.349-5 at 29.[4] These methods often include hand signals while driving; and a white board, pen and paper, video relay service, or a phone app similar to Google translate when not driving.

---

[4] Easterday's deposition was read to the jury at TR.,Vol.3, p.478. Wilbert's video deposition was shown to the jury at TR.,Vol.1, p.235; TR.,Vol.2, p.242. Hilkemann's deposition was read to the jury at TR.,Vol.3, p.473.

16

TR.,Vol.2, p.325; TR.,Vol.3, pp.440-41; R.Doc.349-3 at 16-18; R.Doc.349-5 at 28-30.

The companies' witnesses testified that their training program is the same for deaf drivers as it is for hearing drivers. TR.,Vol.2, pp.326-27, 437, 444; R.Doc.349-3 at 37; R.Doc.349-4 at 10; R.Doc.349-5 at 21-23. Just as they do for inexperienced hearing drivers, these witnesses said, they train inexperienced deaf drivers on public roads and highways, use standard company vehicles, and include them on the delivery schedule. TR.,Vol.2, pp.319-20, 436, 445; R.Doc.349-3 at 25-26, 28; R.Doc.349-4 at 17, 19; R.Doc.349-5 at 21-23. Having the trucks loaded with merchandise, Olds testified, actually makes them easier and safer to drive than the empty trucks in CDL schools. TR.,Vol.1, pp.176-77. "The weight of the load in the trailer helps keep the tires firmly attached to the ground," he said, confirming that "trucks [are] designed to stop with a full load." TR.,Vol.1, p.177. By the time inexperienced deaf drivers have completed their training programs, the five witnesses said, they satisfy all of their companies' safety standards. TR.,Vol.2, pp.326, 445; TR.,Vol.3, pp.469, 596; R.Doc.349-3 at 27; R.Doc.349-4 at 21; R.Doc.349-5 at 41.

17

**D. Werner asserted that no reasonable accommodation would have worked for its training program, which it characterized as unique.**

Werner argued to the jury that federal law allows it to impose "higher safety standards than any other carriers." TR.,Vol.5, p.948. The fact that other companies permit drivers to take their eyes off the road, Werner argued, shows only that Werner has higher standards, not that it discriminates. TR.,Vol.5, pp.947-49.

Yet the jury saw video clips of a hearing Werner student taking his eyes off the road to look at what his trainer was showing him on the dashboard and to look at the trainer while they were having a conversation. *See* Aple.App.29, thumb drive, Ex.52,VideoClipGB150251 at 6:10-6:20 (described at TR.,Vol.1, pp.198-200); Aple.App.29, thumb drive, Ex.52,VideoClipGB010251 at 2:43-3:02 (described at TR.,Vol.1, p.207). The jury also saw several video clips of the student repeatedly taking one or both hands off the wheel—to put a hand in his lap, to emphasize a point he was making verbally, and to drive with one hand while parking the truck. *See* Aple.App.29, thumb drive, Ex.52,VideoClipGB150251 at 4:30-4:41, 5:27-5:43 (described at TR.,Vol.1, pp.198-200); Aple.App.29, thumb drive, Ex.52,VideoClipGB230251 at 0:14-0:32, 2:29-2:33, 3:05-3:30 (described at

18

TR.,Vol.1, pp.200-03); Aple.App.29, thumb drive, Ex.52,VideoClipGB240251 at 1:00-1:30 (described at TR.,Vol.1, pp.203-06); Aple.App.29, thumb drive, Ex.52,VideoClipGB220251 at 4:00-4:38, 6:15-6:58 (described at TR.,Vol.1, p.206); Aple.App.29, thumb drive, Ex.52,VideoClipGB050250 at 0:45-1:23 (described at TR.,Vol.4, p.762). The Werner trainer did not correct any of this allegedly impermissible behavior, even though both the student and the instructor knew that they were being recorded. TR.,Vol.1, pp.203, 206.

Arndt testified that there were ways to communicate all information in Werner's training curriculum non-verbally. TR.,Vol.2, pp.275-76. Much of the over-the-road instruction could occur through hand signals, he said, and much of it could happen when the vehicle was safely stopped. TR.,Vol.2, p.270. He concluded, "I could not find any reason why a deaf driver could not be reasonably accommodated through the Werner training program and into the point of being [an] over-the-road truck driver." TR.,Vol.2, p.252.

## II. District Court Proceedings

The EEOC brought suit under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, alleging that Werner had failed to hire Robinson because of his disability and his need for a reasonable

19

accommodation.[5] App.1, R.Doc.1. The district court denied the parties' cross-motions for summary judgment on the "primary failure-to-hire disability discrimination claim." App.300, R.Doc.265 at 2 (Add.2).

The court granted partial summary judgment to the EEOC on Werner's undue-hardship affirmative defense, rejecting Werner's sole argument that "instantaneous safety training" was fundamental to its business. App.312-13, R.Doc.265 at 14-15 (Add.14-15). "Werner is a trucking company," the court explained. "It carries goods in interstate commerce." App.313, R.Doc.265 at 15 (Add.15). Stating that Werner "only asserts" that instantaneous safety training was fundamental, the court was "not persuaded that providing training with non-verbal instead of verbal cues" would 'fundamentally alter' the nature of Werner's business." *Id.* Moreover, the court reasoned, "Werner has other, more pertinent legal grounds to present its factual argument about safety concerns and the need for verbal interaction." *Id.*

---

[5] The district court consolidated this case for purposes of discovery only with *EEOC v. Werner Enterprises, Inc.*, No. 8:18-cv-329 (D. Neb. filed July 11, 2018), another case against Werner involving an unsuccessful deaf applicant for an over-the-road-driver position. R.Doc.13.

Appellate Case: 24-2286     Page: 31     Date Filed: 11/15/2024 Entry ID: 5457236

The court also granted partial summary judgment to the EEOC on Werner's direct-threat affirmative defense. Relying on Supreme Court precedent, the court observed that employers must make a "particularized enquiry" into the risks an individual employee poses. Add.310, R.Doc.265 at 12 (Add.12) (quoting *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86 (2002)). Werner failed to make the required "individualized assessment" of Robinson, the court said. *Id.* Rather, it rejected all inexperienced deaf drivers as a group. *Id.*

Before trial, the court denied Werner's motions in limine to exclude Marsh's emails and chat logs, and evidence of the hiring practices of other trucking companies regarding deaf drivers. App.425-27, R.Doc.303 at 11-13 (Add.39-41). It granted the EEOC's motion in limine to exclude evidence of Robinson's subsequent performance at other companies, holding that his subsequent performance was irrelevant and "posed a danger of confusing the issue in this trial with [the] 'broader issue of the safety of deaf truck drivers generally.'" App.417-18, R.Doc.303 at 3-4 (Add.31-32).

At trial, at the close of the EEOC's case, the district court granted a partial directed verdict for the EEOC on the element of causation. App.437, R.Doc.316 at 5 (Add.49). "All of Werner's explanations are premised on

21

Robinson's deafness," the court said, "so his disability is the but-for cause of Werner's hiring decision as a matter of law." App.436, R.Doc.316 at 4 (Add.48).

The jury found for the EEOC on the failure-to-hire and failure-to-accommodate claims, and rejected Werner's business-necessity defense. App.477-78, R.Doc.323 at 1-2. It awarded $75,000 in compensatory damages and $36,000,000 in punitive damages. App.478, R.Doc.323 at 2.

The district court held a bench trial on equitable relief and then awarded $35,682.25 in back pay. App.556, R.Doc.353 at 14 (Add.64). It reduced the compensatory/punitive damages award to $300,000 to comply with the statutory cap set out in 42 U.S.C. § 1981a(b)(3). *Id.* The court also ordered injunctive relief tailored to "hearing-impaired applicant[s]." App.558, R.Doc.354 (Add.66.) The court subsequently granted Werner's motion to limit the injunction to "any applicant for an over-the-road truck driving position who possesses an exemption from the Federal Motor Carrier Safety Administration's physical qualifications standard concerning hearing for interstate drivers." App.594, R.Doc.377 at 1 (Add.90). It also granted the EEOC's motion to award $11,010.67 in prejudgment interest. *Id.*

22

## SUMMARY OF ARGUMENT

Werner refused to hire Robinson as an over-the-road driver because he is deaf. It expressly told him so. The jury agreed with the EEOC that Robinson was qualified to perform all essential functions of the job, including training, and found that Werner had violated the ADA by not hiring him and not providing reasonable accommodations. Werner now presents the facts in the light most favorable to itself rather than to the EEOC, and it misstates the applicable law.

Werner has contended throughout this litigation that there is a difference between rejecting an applicant because he is deaf and rejecting him because he cannot hear. The district court correctly recognized that this position lacks merit. Because all of Werner's explanations for not hiring Robinson boil down to his deafness, the district court properly directed a verdict on causation.

The court also correctly dismissed Werner's affirmative defenses of undue hardship and direct threat. Werner offered no evidence that training Robinson through non-verbal means would have fundamentally altered its business, or even its training program. Thus, there was no genuine issue of material fact regarding undue hardship. The district court properly

23

dismissed the direct-threat defense because Werner never conducted the mandatory individualized inquiry. Any error regarding the affirmative defenses would be harmless, in any event, because the defenses would simply have shifted the burden of proof to Werner to show that non-verbal cues during over-the-road training were unsafe. As matters stood, the EEOC had to prove safety as part of its case in chief to show that Robinson was qualified to perform the essential functions of the over-the-road-driver job, including participating in Werner's training program.

Werner's challenges to the district court's evidentiary rulings cannot survive the substantial deference with which this Court must review them. The district court carefully weighed probative value against the potential of unfair prejudice, and Werner cannot show clear and prejudicial abuse of discretion, let alone prejudice warranting a new trial that would be likely to produce a different result.

The court properly allowed the jury to consider punitive damages because trial evidence supported a finding that Werner acted with malice or reckless disregard to Robinson's federally protected rights. The district court pointed to evidence from which the jury could conclude that Werner's decisionmaker had lied about investigating potential

24

accommodations. It also pointed to Robinson's testimony about the way that Werner treated him, and to emails and chat logs showing anti-deaf bias among Werner recruiters and managers, including a manager involved with Robinson's application.

The court acted within its discretion in awarding limited injunctive relief. Evidence showed that, as of the time of judgment, Werner still refused to hire inexperienced deaf drivers. The order simply requires Werner to inform the EEOC for three years about its applicants for over-the-road-driver positions who possess an FMCSA hearing exemption, thus enabling the EEOC to investigate Werner's compliance with the ADA.

Ample evidence supported the district court's decision to allow the jury to determine whether Robinson was qualified. Werner misreads the governing regulation, under which Robinson satisfies the physical qualifications for interstate truck drivers. Werner also misreads the applicable case law, suggesting that it can impose whatever safety standards it desires, regardless of federal anti-discrimination law. The district court was right to reject that argument.

The district court acted within its discretion in awarding pre-judgment interest. Pre-judgment interest is an equitable remedy, and a

25

plaintiff need not mention it in a pretrial order. The parties briefed the question of pre-judgment interest after trial, meaning that Werner was not prejudiced in any way from the failure to reference it specifically in the pretrial order.

Finally, Werner urges this Court to hold that the district court erred in instructing the jury on a stand-alone failure-to-accommodate claim but does not seek reversal on that basis. This Court should not issue an advisory opinion on that question.

## ARGUMENT

### I. The district court correctly directed a verdict on causation because, by Werner's own account, Werner did not hire Robinson because he is deaf.

The ADA prohibits employers from discriminating against qualified individuals "on the basis of disability." 42 U.S.C. § 12112(a). Thus, a plaintiff must establish a "causal link" between their disability and an adverse action.[6] *Brown v. City of Jacksonville*, 711 F.3d 883, 889 (8th Cir. 2013).

---

[6] This Court has not yet addressed the proper causation standard under the ADA. *See Anderson v. KAR Glob.*, 78 F.4th 1031, 1039 n.1 (8th Cir. 2023). Here, as the district court held, App.434, R.Doc.316 at 2 (Add.46), the EEOC

The district court correctly granted the EEOC's motion for a directed verdict on causation, recognizing that "Werner has provided no alternate theory." App.435, R.Doc.316 at 3 (Add.47). Indeed, Werner was explicit about relying on Robinson's deafness as the reason for not hiring him. Vice President of Safety Jaime Hamm testified that Werner would never hire an inexperienced deaf driver because she did not believe a deaf driver could safely complete Werner's training program. TR.,Vol.4, pp.822-23. Werner stated in an interrogatory presented to the jury that "Werner cannot safely train a deaf student during the over the road observed driving portion of the student driver program." App.885-86, Ex.66 at 4-5. And Robinson testified that, when she rejected him, Hamm said, "I'm sorry, we can't hire you because of your deafness." TR.,Vol.2, p.358.

Werner argues that it rejected Robinson because of the safety consequences of his disability, not because of the disability itself. Br. at 17. But that distinction makes no sense in this context: the consequence that Werner is concerned about—Robinson's inability to hear—is synonymous with deafness. The only way to make any sense of Werner's argument is to

_____

has proved causation under the but-for standard, which is more stringent than the alternative "motivating factor" standard.

27

infer that Werner believes that an ADA violation requires disability-related animus. But the ADA contains no such mens rea requirement. "[W]hile our cases have spoken in terms of 'discriminatory animus,'" this Court recently explained, "the ADA does not require evidence of prejudice toward the disabled. Rather, 'animus' in this context means simply that the employer was motivated by the employee's disability." *Sanders v. Union Pac. R.R. Co.*, 108 F.4th 1055, 1062 (8th Cir. 2024).

By Werner's own account, Werner was motivated by Robinson's disability. As the district court said, "Werner claims that it failed to hire Robinson because he could not communicate with a trainer without diverting his eyes from the road—but he couldn't do that *because he is deaf.* He could not engage in instantaneous communication without the use of hand signals or other accommodations, but that's *because he is deaf.* Werner argues it did not hire him because it did not believe it could safely train him…again, *because he is deaf.*" App.436, R.Doc.316 at 4 (Add.48). Thus, "[a]ll of Werner's explanations are premised on Robinson's deafness." *Id.*

This case does not require the Court to address the broader question of whether acting based on the consequences of a disability always establishes causation, including in discipline or policy-violation cases. *See*

28

*Huber v. Westar Foods, Inc.*, No. 23-1087, 2024 WL 3892871, at *1 (8th Cir. Aug. 21, 2024) (granting petition for rehearing en banc to consider ADA causation analysis). Here, Werner itself has invoked Robinson's deafness as an explanation for why training him would be unsafe—as the district court put it, Werner has "just describ[ed] his deafness with more words." App.576, R.Doc.376 at 6 (Add.72).

As one judge in the Fifth Circuit explains, "An employer cannot have it both ways by arguing that [an adverse action] was justified because the disability was dangerous while also maintaining that the safety-threatening disability was not the reason for the [adverse action]." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 350 (5th Cir. 2019) (Costa, J., specially concurring). Instead, "[w]hen a concern about the disability's negative impact on workplace safety is the reason for the adverse action, the 'causation' element of an ADA discrimination claim should be straightforward." *Id.*

*Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194 (7th Cir. 1997), upon which Werner relies, is not to the contrary. *Matthews* held that employers may terminate or refuse to hire employees who cannot perform the essential functions of their jobs, or whose performance is worse than that of other applicants, even when the reason they are not qualified stems

29

from a disability. *See id.* at 1195-96 (giving examples of individuals who are "unable to do [their] job")[7]; *see also Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1219 n.3 (8th Cir. 1999) (addressing the consequences of a disability in the context of employees with "performance deficiencies").

The EEOC agrees that an employer need not employ an individual who cannot perform the essential functions of their job with or without reasonable accommodation. Even if the reason an individual is not qualified is related to a disability, the lack of qualification is always fatal to a claim. 42 U.S.C. § 12112(a). When a plaintiff is unqualified, a court need not even reach the question of causation.

Separately, Werner argues that a jury could have found that it rejected Robinson because he was inexperienced. Br. at 20. This is a red herring. "Often, events have multiple but-for causes," and "a defendant cannot avoid liability just by citing some *other* factor that contributed to its

---

[7] Werner quotes *Matthews* as stating that a qualified individual may be terminated "for any reason other than that he is disabled…even if the reason is the consequence of the disability." Br. at 15 (quoting *Matthews*, 128 F.3d at 1196). However, the only example the *Matthews* court gives is of an individual who is "unable to do his job." *Matthews*, 128 F.3d at 1196 (quoted in Br. at 15).

Appellate Case: 24-2286    Page: 41    Date Filed: 11/15/2024 Entry ID: 5457236

challenged employment decision." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020)). Evidence showed that Werner hires experienced deaf drivers and inexperienced hearing drivers—but not inexperienced deaf drivers. *See* TR.,Vol.4, p.741. Robinson's inexperience and his deafness were *both* but-for causes of his rejection.

## II. The district court correctly dismissed Werner's affirmative defenses of undue hardship and direct threat because Werner showed no genuine issues of material fact, and, even if the court did err, any error was harmless.

### A. Undue Hardship

The district court properly granted summary judgment to the EEOC on Werner's undue-hardship affirmative defense. *See* App.312-13, R.Doc.265 at 14-15 (Add.14-15). The ADA provides an affirmative defense to failure-to-accommodate claims when an employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). "Undue hardship" means "significant difficulty or expense," when considered in light of "the nature and net cost of the accommodation needed," the "overall financial resources," the "type of operation or operations of the covered entity," and "the impact…of [the] accommodation upon the

31

operation of the facility." *Id.* § 12111(10)(A), (B)(i)-(iv). Both the EEOC and this Court have recognized that an accommodation that "would fundamentally alter the nature or operation of [a] business" imposes an undue hardship. Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. pt. 1630, app. § 1630.2(p); *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1101 (8th Cir. 1999) (a "fundamental alteration in the nature of the program" is an undue hardship (citation omitted)).

EEOC Guidance offers a helpful example of a fundamental alteration to the nature or operation of a business. "[S]uppose an individual with a disabling visual impairment that makes it extremely difficult to see in dim lighting applies for a position as a waiter in a nightclub and requests that the club be brightly lit as a reasonable accommodation," the Guidance says. 29 C.F.R. pt. 1630, app. § 1630.2(p). "Although the individual may be able to perform the job in bright lighting, the nightclub will probably be able to demonstrate that that particular accommodation, though inexpensive, would impose an undue hardship if the bright lighting would destroy the ambience of the nightclub and/or make it difficult for the customers to see the stage show." *Id.*

Here, as the district court explained, App.313, R.Doc.265 at 15 (Add.15), Werner has given no explanation—let alone adduced any evidence—to suggest why using non-verbal training cues would transform a trucking business's operations in an analogous way. To the contrary, Werner has focused not on the nature or operation of its business, but on the impact on its training program.

This is the wrong framing. Title I of the ADA speaks in terms of undue hardship "on the operation of the *business* of [the] covered entity." 42 U.S.C. § 12112(B)(5)(A) (emphasis added). While this Court's opinion in *Buckles* refers to "a fundamental alteration in the nature of [a] *program*," *Buckles* drew that language from Title II of the ADA. *See* 176 F.3d at 1101 (quoting *DeBord v. Bd. of Educ.*, 126 F.3d 1102, 1106 (8th Cir. 1997) (Title II case)) (emphasis added). Unlike Title I, which covers employment, Title II covers "services, programs, or activities of a public entity." 42 U.S.C. § 12132. The *Buckles* Court went on to hold that the plaintiff's desired accommodations "would impose an undue financial and administrative burden" on the employer and did not apply a fundamental-alteration analysis at all. 176 F.3d at 1101.

Appellate Case: 24-2286    Page: 44    Date Filed: 11/15/2024 Entry ID: 5457236

Even assuming that the relevant question is whether using non-verbal cues would fundamentally alter Werner's training program, rather than its business as a whole, the company still failed to present a triable issue as to undue hardship. The Supreme Court explained in *Southeastern Community College v. Davis*, 442 U.S. 397 (1979), what it means to fundamentally alter a training program. The plaintiff in that case was a licensed practical nurse who was denied admission to nursing school because of her hearing disability. *Id.* at 401-02. Even with a hearing aid, she could not understand speech without lipreading. *Id.* at 403. "In light of respondent's inability to function in clinical courses without close supervision," the Court said, "Southeastern, with prudence, could allow her to take only academic classes. Whatever benefits respondent might realize from such a course of study, she would not receive even a rough equivalent of the training a nursing program normally gives. Such a fundamental alteration in the nature of a program is far more than the 'modification' the regulation requires." *Id.* at 409-10.

Unlike Davis, Robinson required no substantive changes to the training program. He did not ask to be trained on a simulator rather than on the roads, or to be allowed to watch videos or do training exercises on

34

paper—requests that would, indeed, have constituted fundamental alterations akin to removing the practical aspects of the nursing program in *Davis*. To the contrary, he sought to do everything that a hearing trainee would do, only by means of non-verbal instruction. Ultimately, the jury found that such instruction would have been safe.

In any event, even if the district court erred, any such error would be harmless. Werner does not claim that it would have introduced more or different evidence if the court had not granted summary judgment on the undue-hardship defense. At trial, the court placed the burden of proof on the EEOC to show that Robinson could perform all essential functions of the job, either with or without a reasonable accommodation. App.464, R.Doc.322 at 10. The court instructed the jury that "Werner alleges the trainer-observed over-the-road component of its placement driver program is an essential function, and there was no reasonable accommodation that would enable Robinson to safely complete that function." *Id.* The jury heard conflicting evidence regarding the safety of training Robinson with non-verbal instruction, and it found for the EEOC. Had the district court not granted summary judgment, and had the jury been required to consider the undue-hardship defense, this would only have shifted the

35

burden of proof regarding safety to Werner—which would have been more onerous for the company. *See* 42 U.S.C. § 12112(b)(5)(A) (undue hardship is an affirmative defense).

Thus, granting summary judgment to the EEOC provides no basis for reversal. *Cf. Beshears v. Asbill*, 930 F.2d 1348, 1352 (8th Cir. 1991) ("[W]e are satisfied that in the circumstances of this case the error [of shifting the burden of proof] was harmless."); *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006) ("Harmless errors in parts of a jury charge that do not prejudice the complaining party are not sufficient grounds on which to vacate a judgment and order a new trial.").

### B. Direct Threat

The district court properly granted summary judgment on Werner's direct-threat affirmative defense. *See* App.309, R.Doc.265 at 11-12 (Add.11-12). The ADA provides a "direct threat" affirmative defense where an individual poses "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. §§ 12111(3), 12113(b). Regulations require that the determination of whether an individual poses a direct threat "shall be based on an individualized assessment of the individual's present ability to safely perform the essential

36

functions of the job." 29 C.F.R. § 1630.2(r); *see also* 42 U.S.C. § 12116 (directing EEOC to promulgate regulations to implement Title I of the ADA).

Contrary to the regulations, Werner never conducted an individualized inquiry regarding Robinson. Hamm testified at summary judgment that she looked unsuccessfully for research regarding commercial drivers who are hard of hearing. R.Doc.250-11 at 16-17.[8] She considered deaf drivers as a group, not Robinson as an individual. *See id.* at 16-22. The district court rightly said, "Werner's assessment of…Robinson wasn't bespoke—it was off-the-rack." App.310, R.Doc.265 at 12 (Add.12).

For the same reasons that granting summary judgment on the undue-hardship defense was harmless error if error at all, *see supra* pp.35-36, granting summary judgment on the direct-threat defense would also be harmless error. Werner does not contend that it would have introduced more or different evidence if the district court had not granted summary judgment. The jury agreed with the EEOC that Robinson would not have posed a safety risk by participating in Werner's over-the-road training

_____

[8] Hamm's last name at the time of the deposition was Maus.

37

program—and the EEOC had the burden of proof on this issue. Had the district court not granted summary judgment, and had the jury been required to consider the direct-threat affirmative defense, Werner would have had the burden of proof. It would have gained nothing from allowing the jury to consider that safety issue again through the prism of a direct threat defense.

## III. The district court acted within its discretion when making evidentiary rulings.

### A. Standard of Review

Relevant evidence is generally admissible. Fed. R. Evid. 402. Courts may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "With respect to evidentiary questions in general and Rule 403 in particular, a district court virtually always is in the better position to assess the admissibility of the evidence in the context of the particular case before it." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008).

Appellate Case: 24-2286     Page: 49     Date Filed: 11/15/2024 Entry ID: 5457236

This Court reviews evidentiary rulings for "clear and prejudicial abuse of discretion," *Coterel v. Dorel Juv. Grp., Inc.*, 827 F.3d 804, 807 (8th Cir. 2016), giving "substantial deference" to the district court, *Life Plus Int'l v. Brown*, 317 F.3d 799, 803 (8th Cir. 2003) (citation omitted). "Even if an abuse of discretion occurs, a trial court's ruling on a motion for new trial will only be reversed if 'an evidentiary ruling was so prejudicial as to require a new trial which would be likely to produce a different result.'" *Townsend v. Bayer Corp.*, 774 F.3d 446, 461 (8th Cir. 2014) (citation omitted).

## B. Discussion

### 1. The court reasonably admitted relevant evidence that Werner recruiters and managers, including a manager who played a role in Robinson's rejection, were biased against deaf people.

Werner argues that the district court wrongly admitted "stray remarks" into evidence: namely, discriminatory comments by Werner recruiters and managers about deaf people. Br. at 30-34. First, Werner's suggestions that stray remarks are inadmissible is wrong. "Stray remarks"—i.e., statements by non-decisionmakers and statements not made in conjunction with the challenged employment action—"standing alone, may not give rise to an inference of discrimination, [but] such

39

remarks are not irrelevant." *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 922 (8th Cir. 2000). Such statements "are surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow, thus providing additional threads of evidence that are relevant to the jury." *Id.* at 922-23 (cleaned up). The district court was well within its discretion to admit Werner employees' comments evincing animus towards deaf people, and the jury raised its eyebrows accordingly.

Marsh's conversations, whether considered "stray" or not, are particularly relevant because the jury could reasonably have determined that Marsh was a decisionmaker. Werner argues that "[t]here is no evidence [Marsh] had any hand in the decision not to hire Robinson in 2016." Br. at 30. But the district court pointed to evidence that "at the time Robinson was not hired, Marsh was a manager of student and driver recruiting; Marsh spoke directly with Jaime Hamm, who ultimately decided not to hire Robinson; Marsh spoke with Robinson about his application personally; and Marsh participated in the phone call with Robinson and Hamm when Robinson was told he would not be hired because Werner would not accommodate his deafness." App.581, R.Doc.376 at 11 (Add.77). These facts, the court said, suggested that Marsh

40

"was either in a decision-making capacity or participated with the decision-maker in the capacity of this case." TR.,Vol.3, p.538. This Court must grant "substantial deference" to the district court's assessment of the evidence. *See Life Plus Int'l*, 317 F.3d at 803.

Werner also argues that the court should have excluded the comments because they occurred two years after Werner rejected Robinson. Br. at 30. But, as the district court said, "the timing of the emails was not so far removed from the relevant period, especially considering that Marsh held the same position when she sent the emails as when Robinson was not hired." App.581, R.Doc.376 at 11 (Add.77). This, too, was a reasonable determination. *See Life Plus Int'l*, 317 F.3d at 803 (reviewing court must give "substantial deference" on evidentiary rulings).

To the extent Werner argues that admitting the employees' discriminatory remarks was prejudicial, Br. at 34, as this Court has recognized, "[d]amaging evidence is always prejudicial; the question is whether the evidence is *unfairly* prejudicial." *United States v. Musk*, 719 F.3d 962, 967 (8th Cir. 2013) (citation omitted). Here, the district court concluded that "the probative value is not outweighed by any unfair prejudice." TR.,Vol.3, p.542. Marsh, the court said, could testify that the emails and

41

chats did not accurately reflect her or Werner's attitudes. App.582, R.Doc.376 at 12 (Add.78). In fact, she did testify to that effect. TR.,Vol.3, p.570. The jury was free to assess her credibility and weigh her discriminatory remarks as it saw fit. The court's decision to allow it to do so was well within its discretion. *See Sprint/United Mgmt. Co.*, 552 U.S. at 387 ("[A] district court virtually always is in the better position to assess the admissibility of the evidence in the context of the particular case before it.").

Even assuming *arguendo* that the court should have excluded the evidence, any such error would be harmless. Werner asserts that the discriminatory comments inappropriately encouraged the jury to award punitive damages, Br. at 33-34, but there was ample other evidence upon which the jury could have based a punitive damages award. *See supra* pp. 9-10 (discussing evidence of Hamm's flawed or non-existent investigation of potential accommodations, and Robinson's testimony regarding his experience); *see also Heaton v. Weitz Co., Inc.*, 534 F.3d 882, 887 (8th Cir. 2008) ("We will not set aside a jury verdict unless there is a complete absence of probative facts to support the verdict.") (cleaned up). And, even if the emails and chat logs caused the jury to award a larger sum of money than

42

it might otherwise have done, the district court reduced the jury's award of compensatory and punitive damages by more than ninety-nine percent. App.573, R.Doc.376 at 3 (Add.69); *see* 42 U.S.C. § 1981a(b)(3) (statutory damages cap).

> **2. The court reasonably admitted relevant evidence that other trucking companies have successfully accommodated deaf drivers.**

The district court acted within its discretion in admitting evidence that other trucking companies have successfully used the same reasonable accommodations that Robinson sought here. The sole purpose of this evidence was to show that non-verbal communication is, in fact, a realistic and safe method for training inexperienced deaf truck drivers. The EEOC did not argue that Werner should have used these reasonable accommodations *because* the other trucking companies had done so; it argued, rather, that the practices of other companies demonstrated that the accommodations worked. *See* TR.,Vol.5, p.925 ("It's not that Werner must do what other companies are doing, but the fact that other companies are doing it proves that Werner can."). The district court recognized this distinction, correctly observing that the evidence "is relevant to the issue of

43

whether Werner's refusal to train deaf drivers is reasonable." App.426, R.Doc.303 at 12 (Add.40).

As Werner does now on appeal, it argued to the jury that the practices of other companies were irrelevant because it is entitled to impose more stringent safety standards of its own. TR.,Vol.5, pp.947-49. Werner is correct that it may set its own safety standards—but only to the extent it does not run afoul of the ADA. *See* 29 C.F.R. § 1630.15(b) (defenses to charges of discriminatory application of selection criteria).

Werner cites *EEOC v. Schneider National, Inc.*, 481 F.3d 507 (7th Cir. 2007), for the proposition that "the fact that another employer…[is] willing to assume a risk does not compel [Werner] to do likewise." Br. at 35. But Werner takes this sentence from *Schneider* out of context. *Schneider* does not provide blanket permission for a company to set any safety standards it chooses, regardless of the ADA's requirements. Instead, this point in *Schneider* was tied exclusively to its analysis of whether a company "regarded" an employee "as disabled" because it mistakenly believed that his neurological condition made him unable to perform a broad class of jobs (a now-abrogated legal standard). *See Schneider*, 481 F.3d at 511 (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), *abrogated by* ADA

44

Amendments Act of 2008, Pub. L. No. 110-325, sec. 2(a)(4), 122 Stat. 3553).

Nothing in *Schneider* suggests that the training practices of other trucking

companies are irrelevant to whether Werner could have accommodated

Robinson during its training program.

### 3. The court reasonably excluded irrelevant and unduly prejudicial evidence of Robinson's subsequent driving record.

The district court acted within its discretion in excluding evidence of

Robinson's subsequent driving record. Relevant evidence must have a

"tendency to make a fact more or less probable than it would be without

the evidence" and must be "of consequence in determining the action."

Fed. R. Evid. 401. The issue before the jury was not whether Robinson was

a safe driver, but whether it was possible to train him safely through non-

verbal communication. The district court reasonably determined that

Robinson's subsequent accidents as a solo driver had "little relevance" to

the viability of non-verbal training. App.582, R.Doc.376 at 12 (Add.78).

Werner counters, without evidence, that Robinson's subsequent

accidents "tend[] to show a new driver who does not receive [verbal]

instructions may not be properly trained to safely operate a CMV solo." Br.

at 37. This argument makes exactly the same prejudicial assumption a jury

45

might: that any subsequent accidents were due to Robinson's not having received verbal training—i.e., his being deaf. Yet, although Werner does not hire inexperienced deaf drivers, it does hire experienced deaf drivers. TR.,Vol.4, p.823. It is self-evident that no deaf over-the-road driver has received verbal instruction. Thus, Werner's own hiring practice undermines its contention that non-verbal training is a safety risk.

Even if Robinson's subsequent driving record were tangentially relevant, the district court reasonably concluded that evidence regarding his accidents would likely derail the trial. "This evidence presented risks of confusing the issues, inflaming prejudice against deaf drivers generally, and needlessly extending the trial to include 'mini-trials' about the facts and circumstances of each accident in which Robinson was involved," the court explained. App.582, R.Doc.376 at 12 (Add.78). This Court must grant "substantial deference" to that determination. *See Life Plus Int'l*, 317 F.3d at 803.

Whether the district court had discretion to admit the evidence or whether this Court would have done so are not the relevant inquiries. The only question is whether failure to admit the evidence "was so prejudicial as to require a new trial which would be likely to produce a different

46

result." *Townsend*, 774 F.3d at 461. Especially in light of evidence that Werner itself hires experienced deaf drivers who have been trained via non-verbal communication, there is no reason to believe that admitting evidence of Robinson's subsequent accidents would likely have made a difference.

**IV. The district court correctly allowed the jury to consider punitive damages because trial evidence supported the conclusion that Werner acted with malice or reckless indifference to Robinson's rights.**

### A. Standard of Review

This Court reviews de novo the question of whether there was sufficient evidence of malice or reckless indifference to submit the question of punitive damages to the jury. *United States v. Rupp*, 68 F.4th 1075, 1080 (8th Cir. 2023). The Court must view the evidence "in the light most favorable to the verdict." *Id.*; *see also Salitros v. Chrysler Corp.*, 306 F.3d 562, 570 (8th Cir. 2002) (same).

### B. Discussion

The ADA authorizes an award of punitive damages when an employer acts "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. §§ 1981a(a)(2), (b)(1). Malice or reckless indifference "pertain to the employer's knowledge

47

that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999).

Contrary to Werner's assertion, this Court did not hold in *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894 (8th Cir. 2006), that safety concerns are inconsistent with punitive damages as a matter of law. *See* Br. at 39-40 (citing *Canny*). Werner reads *Canny* out of context.

The legally blind employee in *Canny* sought to drive a forklift in a warehouse only months after another employee had sustained a serious arm injury. *Canny*, 439 F.3d at 903. This Court held that the employer "reasonably perceived itself caught between federal regulations under the Occupational Safety and Health Administration and federal law under the ADA, and made a culpable, but not malicious or reckless, decision based upon safety concerns." *Id.* Explaining this decision three years later, this Court emphasized that "in *Canny*, there was no evidence that the employer was aware that it may have been violating the ADA. On the contrary, the employer thought its actions were required by other federal regulations." *EEOC v. Siouxland Oral Maxillofacial Surgery Assocs., L.L.P.*, 578 F.3d 921, 927 (8th Cir. 2009).

48

Here, in contrast, Werner has never argued that it believed federal law required it to reject Robinson's application. Although Werner insists that it was motivated by safety, the district court pointed to evidence from which a jury could find that Werner knew it was "acting in violation of federal law." *See Kolstad*, 527 U.S. at 535.

"It's distinctly possible," the court said, "that a jury did not find Hamm's characterization of her hiring decision to be credible." App.586, R.Doc.376 at 16 (Add.82). Despite her testimony that she had investigated ways of accommodating Robinson, the court observed, Hamm "did not communicate with any of Werner's trainers to identify anyone who might know American Sign Language, or any concerns (or lack thereof) the trainers might have about training deaf drivers." App.585, R.Doc.376 at 15 (Add.81). Moreover, the court added, Lance Knapp—an investigator for the Nebraska Equal Opportunity Commission—testified that Hamm told him "she had not done *any* research about possible accommodations" and "did not say she reached out to the FMCSA, the EEOC, or the Nebraska Department of Transportation, contrary to Hamm's own testimony." App.585-86, R.Doc.376 at 15-16 (Add.81-82).

49

Werner discounts this evidence, stating only that a jury could have determined that "Hamm's investigation into potential accommodations could have been more rigorous." Br. at 40. Yet, this interpretation wrongly views the evidence in the light most favorable to Werner, not in the light most favorable to the EEOC, as required. *See Rupp*, 68 F.4th at 1080.

The district court also said that Robinson's testimony supported punitive damages. App.586, R.Doc.376 at 16 (Add.82). After Robinson attended a Werner-owned CDL school, the court said, Werner encouraged him to apply, pre-approved his application, and conducted a thirty-minute interview, only for Hamm to tell him that Werner would not hire him because he is deaf. *Id.*

Contrary to Werner's assertion that punitive damages rested largely on Marsh's emails and chat logs, Br. at 40-41, the district court held that these "were neither dispositive nor the primary evidence of maliciousness or reckless indifference." App.585, R.Doc.376 at 15 (Add.81). Looking at all the evidence together, the court reasoned, "Robinson's testimony about his experience, Marsh's discriminatory remarks, and Hamm's testimony all support the submission of punitive damages to the jury." App.586, R.Doc.376 at 16 (Add.82). This conclusion was legally sound.

50

**V.    The district court acted within its discretion in ordering injunctive relief because, as of the time of judgment, Werner still refused to hire inexperienced deaf drivers who possessed an exemption from the federal hearing requirement.**

The ADA authorizes district courts to "order such affirmative action as may be appropriate" upon a finding of intentional discrimination. 42 U.S.C. § 2000e-5(g)(1); *see also* 42 U.S.C. § 12117(a) (making § 2000e-5(g) applicable to the ADA). The court has "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (citation omitted).

The injunction here does precisely that. The district court ordered that, for a period of three years from the date of judgment, Werner must report in writing to the EEOC no less frequently than every six months the name and available contact information for any applicant for an over-the-road truck-driving position who possesses an FMCSA hearing exemption, the date of the application, whether or not Werner hired the applicant, the dates on which the employment decision was made and communicated to the applicant, the basis for rejecting any such applicants, whether any such applicant whom Werner hired remained employed with Werner six

51

months after being hired, and if not, the reason for the separation. App.594-95, R.Doc.377 at 1-2 (Add.90-91). The court required Werner to file proof of such reports with the court. App.595, R.Doc.377 at 2 (Add.91).

Werner incorrectly criticizes the basis for this injunction. Citing *Briscoe v. Fred's Dollar Store, Inc.*, 24 F.3d 1026, 1028-29 (8th Cir. 1994), Werner states that "[i]njunctive relief is generally reserved for cases involving a 'consistent practice' of discrimination affecting multiple individuals." Br. at 42. *Briscoe* did involve a "consistent practice," but it did not suggest that injunctive relief should be limited to such cases. To the contrary, this Court has stated that where a "discriminatory atmosphere" exists, "the more common forms of relief, such as reinstatement and back pay, may not be appropriate or adequate, and the district court should fashion injunctive relief to alleviate the unlawful practice before it." *Taylor v. Jones*, 653 F.2d 1193, 1203-04 (8th Cir. 1981).

Neither this Court nor any other has held that injunctive relief must rest upon discrimination against more than one individual. As the Seventh Circuit has explained, "Because the determinative judgment is about the employer's potential future actions, the EEOC need not prove that the employer previously engaged in widespread discrimination, and

52

'injunctive relief is appropriate even where the [EEOC] has produced no evidence of discrimination going beyond the particular claimant's case.'" *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 840 (7th Cir. 2013) (citation omitted).

Here, the district court relied on trial evidence to find a discriminatory atmosphere warranting injunctive relief. App.553, R.Doc.353 at 11 (Add.61). This evidence includes Hamm's testimony that, as of the date of trial, Werner had never hired an inexperienced deaf applicant who would have to go through Werner's training program and that, from her perspective, there is no way for deaf trainees to communicate safely with a trainer in the cab. TR.,Vol.4, pp.822-23. It also includes Marsh's emails and chat logs, which show that Werner recruiters and managers, including Marsh, made disparaging jokes and comments about deaf individuals in general and deaf truck drivers in particular. *See* App.629, Ex.23 at 12; App.637, Ex.25 at 7; App.640-41, Ex.26 at 1-2.

The district court did not abuse its discretion in determining that this evidence showed a risk of future harm warranting injunctive relief. The court emphasized that, because of the statutory cap on damages, Werner would pay "not even *one percent* of the jury's intended award." App.554,

53

R.Doc.353 at 12 (Add.62). This amount, the court reasoned, "will do little to deter Werner from future discriminatory hiring decisions." *Id.*

Observing that the EEOC has been unable to identify other unsuccessful deaf applicants because Werner does not retain such information, the court concluded that "[i]njunctive relief should be targeted at assisting the EEOC in identifying discrimination by Werner." *Id.* This was a reasonable exercise of the court's equitable powers.

**VI. The district court correctly allowed the jury to determine whether Robinson was qualified because he satisfied federal physical-qualification standards and there was sufficient evidence from which the jury could find that he could perform all essential functions of the job.**

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A "qualified individual" is one who "satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m); *see also* 42 U.S.C. § 12111(8).

Appellate Case: 24-2286     Page: 65     Date Filed: 11/15/2024 Entry ID: 5457236

## A. Werner is incorrect that Robinson was unqualified as a matter of law.

Werner erroneously argues that Robinson is not qualified because he cannot satisfy the generally applicable hearing requirement for commercial truck drivers. Br. at 44-47 (citing 49 C.F.R. § 391.41(b)(11)). But this argument proves too much, given that Werner hires experienced deaf drivers.

Regardless, Werner's argument fails on its merits. According to Werner, the Supreme Court held in *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999), *superseded on other grounds*, that "an employer does not violate the ADA by requiring compliance with a DOT qualification standard *even if the applicant obtained a waiver from that standard*." Br. at 44. As the district court explained, App.577, R.Doc.376 at 7-8 (Add.73-74), Werner misinterprets that case.

In *Kirkingburg*, an employer terminated a truck driver who could not meet regulatory vision requirements and refused to rehire him even after he obtained an "experimental" waiver. 527 U.S. at 560. The Federal Highway Administration ("FHA") had established the experimental-waiver program based on a hypothesis that the regulatory vision

55

requirements could be relaxed without compromising safety. *Id.* at 574-76.

The purpose of the program was to obtain objective data to prove or

disprove that proposition. *Id.* The governing regulations did not refer to the

experimental program and "contain[ed] no qualifying language about

individualized determinations." *Id.* at 570, 574-75. Accordingly, the

experimental program "did not modify the general visual acuity

standards." *Id.* at 574. The Court held that employers were not required to

accept FHA's yet-unproved hypothesis that the waivers were safe. *Id.* at

577.

     The hearing exemption at issue here bears no resemblance to the

"experimental" waiver program in *Kirkingburg.* Subsection (b)(11) of

49 C.F.R. § 391.41 sets forth the general rule that an individual is physically

qualified to drive a commercial vehicle if they meet specified hearing

standards. But subsection (a)(3) provides that an individual is physically

qualified *either* if they meet the requirements of subsection (b)(11) *or* if they

"obtained from FMCSA a medical variance from the physical qualification

standards in paragraph (b) of this section." Unlike the regulation at issue in

*Kirkingburg*, therefore, the hearing exemption is incorporated into the

56

physical qualification standards and is an alternative, non-experimental way for an individual to be physically qualified.

The district court correctly relied on this distinction to reject Werner's argument. App.304-05, R.Doc.265 at 6-7 (Add.6-7). As the court stated, "Werner isn't opting out of an experimental program waiving federal safety regulations, as in *Albertson's*. Rather, Werner is trying to opt out of an established program operating *within* federal safety regulations. If Werner wants to challenge the wisdom of the current federal regulatory regime, there are procedures for that. But the regulations as they stand provide Werner with no safe harbor for disability discrimination." App.306, R.Doc.265 at 8 (Add.8).

## B. Sufficient evidence supports the jury's finding that Robinson was qualified.

### 1. Standard of Review

"[J]udges must be extremely guarded in granting judgments as a matter of law after a jury verdict." *Ryther v. KARE 11*, 108 F.3d 832, 844 (8th Cir. 1997) (en banc). "*Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear.* But where…there is an evidentiary basis for the jury's verdict, the jury is free to discard or

57

disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." *Id.* at 845 (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)).

### 2. Discussion

Werner seeks to overturn the jury verdict based on its own interpretation of the conflicting evidence presented at trial. Contrary to Werner's assessment, there was not a "complete absence of probative facts" to support the jury's finding that Werner was qualified. *See id.*

To the extent Werner argues that keeping one's eyes on the road was an "essential function," Br. at 48-49, Werner misunderstands the ADA. The "essential function requirement focuses on the desired result rather than the means of accomplishing it." *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 280 (3d Cir. 2001) (quoting 136 Cong. Rec. 11,451 (1990)). Here, the desired result was making Robinson a safe driver, not training him with his eyes on the road at all times.

The jury heard testimony from Olds and Arndt, the EEOC's two expert witnesses, who explained how and why it was safe to train deaf

drivers. TR.,Vol.1, pp.166-68, 170, 210; TR.,Vol.2, pp.252, 266. Olds testified

that it was unsafe for any driver to stare fixedly at the road because this

could lead to "highway hypnosis." TR.,Vol.1, p.168. He also testified that

the amount of time it would take for a deaf driver to glance at a trainer's

hand signals was comparable to the amount of time it would take for any

driver to check the rear-view mirror or change the radio station. TR.,Vol.1,

pp.166-67. Similarly, he testified, it was safe for a driver—hearing or deaf—

to briefly take one hand off the wheel, for instance to get a drink, change

radio stations, roll up a window, or turn on the blinkers. TR.,Vol.1, p.170.

The jury watched several video clips in which a hearing Werner student

repeatedly took one or both hands off the wheel or his eyes off the road. *See*

Aple.App.29, thumb drive, Ex.52,VideoClipGB150251 at 4:30-4:41, 5:27-5:43

(described at TR.,Vol.1, pp.198-200); Aple.App.29, thumb drive,

Ex.52,VideoClipGB230251 at 0:14-0:32, 2:29-2:33, 3:05-3:30 (described at

TR.,Vol.1, pp.200-03); Aple.App.29, thumb drive, Ex.52,VideoClipGB240251

at 1:00-1:30 (described at TR.,Vol.1, pp.203-06); Aple.App.29, thumb drive,

Ex.52,VideoClipGB220251 at 4:00-4:38, 6:15-6:58 (described at TR.,Vol.1,

p.206); Aple.App.29, thumb drive, Ex.52,VideoClipGB010251 at 2:43-3:02

59

(described at TR.,Vol.1, p.207); Aple.App.29, thumb drive,

Ex.52,VideoClipGB050250 at 0:45-1:23 (described at TR.,Vol.4, p.762).

Olds also testified to the efficacy of reasonable accommodations,

including hand signals, whiteboards, colored flags, flash cards, American

Sign Language, and pen and paper for more extensive communications

when the truck was safely stopped. TR.,Vol.1, pp.162, 169, 211-12.

Representatives of five trucking companies testified that they have

successfully used those accommodations in their training programs.

TR.,Vol.2, pp.326, 445; TR.,Vol.3, pp.469, 596; R.Doc.349-3 at 27; R.Doc.349-

4 at 21; R.Doc.349-5 at 41. Robinson, himself, testified that he had used

several of those methods while learning to drive trucks at Roadmaster, a

Werner-owned school. TR.,Vol.2, p.338.

Whether or not a different jury might have agreed with Werner's

interpretation of the evidence, this jury did not. Because there is an

evidentiary basis for its verdict, this Court may not reverse based on

insufficiency of the evidence. *See Ryther*, 108 F.3d at 845.

60

**VII.    The district court acted within its discretion in awarding prejudgment interest, which is an indispensable element of make-whole relief.**

The district court acted within its discretion in holding that the EEOC had not waived its claim for prejudgment interest by not including it in the pretrial order. Werner is correct that "theories of damages" are generally waived unless included in a pretrial order. *See Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) (cited in *Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 831 (8th Cir. 2019)). But prejudgment interest is not a form of damages. *See* Br. at 50. To the contrary, prejudgment interest under the ADA is an equitable remedy. *See Winbush v. Iowa*, 66 F.3d 1471, 1483 (8th Cir. 1995) (authorizing prejudgment interest under Title VII because Title VII grants courts power to order "equitable relief as the court deems appropriate" (quoting 42 U.S.C. § 2000e-5(g)(1))); 42 U.S.C. § 12117(a) (making Title VII's enforcement provisions applicable to the ADA).

Prejudgment interest constitutes equitable relief because its purpose is, in part, "compensation for the inability to use the money between the time of the compensable injury and the time that the award is paid." *Leonard v. Sw. Bell Corp. Disability Income Plan*, 408 F.3d 528, 533 (8th Cir. 2005). Prejudgment interest also accounts for the fact that "a dollar received

61

in 1992 is worth considerably more than a dollar in 2009." *RK Co. v. See*, 622 F.3d 846, 853-54 (7th Cir. 2010) (citation omitted). Thus, prejudgment interest is necessary for make-whole relief. *See West Virginia v. United States*, 479 U.S. 305, 310 (1987) (prejudgment interest is "an element of complete compensation"); *Leonard*, 408 F.3d at 533 (prejudgment interest is "an ordinary part of compensatory awards").

Under Rule 54(c) of the Federal Rules of Civil Procedure, "[e]very [non-default] final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." By extension, the court must grant such relief even if it is not included in the pretrial order. As the Fifth Circuit has explained, to hold "that failure to specifically request pre-judgment damages in the pre-trial order bars a judge from awarding them in his final judgment would undermine [Rule 54(c)]." *Rathborne Land Co., L.L.C. v. Ascent Energy, Inc.*, 610 F.3d 249, 262 (5th Cir. 2010) (cleaned up) (upholding award of prejudgment interest).

In *Leonard*, this Court remanded an ERISA claim with instructions for the district court to consider prejudgment interest even though the plaintiff had only mentioned it in a brief concerning attorney fees. *Leonard*, 408 F.3d at 533. Werner asserts that *Leonard* was "inapposite…because the

62

governing statute required prejudgment interest." Br. at 50. Not so. Like the ADA, ERISA authorizes prejudgment interest as a discretionary form of "other appropriate equitable relief." 29 U.S.C. §§ 1132(a)(3)(B), (a)(5); *see Christianson v. Poly-Am., Inc. Med. Ben. Plan*, 412 F.3d 935, 941 (8th Cir. 2005) (ERISA authorizes prejudgment interest "where necessary to afford the plaintiff other appropriate equitable relief under [29 U.S.C.] section 1132(a)(3)(B)"); *see also Delcastillo v. Odyssey Res. Mgmt., Inc.*, 292 F. App'x 519, 520 (8th Cir. 2008) (remanding ERISA case for district court to "determine whether prejudgment interest…is warranted").[9]

Other circuits have likewise required consideration of prejudgment interest irrespective of whether it was in a pretrial order. *See RK Co.*, 622 F.3d at 853-54 ("[A] failure to request prejudgment interest in the final pretrial order does not result in a waiver."); *Rocket Jewelry Box, Inc. v. Quality Int'l Packaging, Ltd.*, 90 F. App'x 543, 547 (Fed. Cir. 2004) (court could grant prejudgment interest whether or not plaintiff had specifically requested it); *Dalal v. Alliant Techsys., Inc.*, No. 94-1483, 1995 WL 747442, at

---

[9] ERISA does require prejudgment interest in one specific circumstance: when the purchase of an insurance contract or annuity in connection with the termination of pension benefits violates the statute. 29 C.F.R. § 1132(a)(9). Those were not the facts of *Leonard*.

63

*6 (10th Cir. Dec. 18, 1995) (failure to request prejudgment interest in pretrial order "did not preclude the district court from making the award").

Notwithstanding Rule 54(c)'s mandate to order all relief to which each party is entitled, the rule does not apply "where the failure to ask for particular relief so prejudiced the opposing party that it would be unjust to grant such relief." *Cooper v. Gen. Am. Life Ins. Co.*, 827 F.3d 729, 732 (8th Cir. 2016) (citation omitted). In *Cooper*, for example, the plaintiff provided insufficient notice by first mentioning "the possibility of a breach of contract claim" in a reply brief. *Id.*

Here, Werner does not and cannot explain why the failure to mention prejudgment interest in the pretrial order "so prejudiced [it] that it would be unjust to grant such relief." *See id.* The pretrial order catalogued "controverted and unresolved issues," and expressly stated that one such issue was "[w]hether the Court should order equitable or injunctive relief and the nature and scope of such relief, if any." Aple.App.5, R.Doc.286 ¶ 19. Consistent with the pretrial order, the parties briefed equitable issues post-trial, including the availability of prejudgment interest. *See* R.Doc.349; R.Doc.350. Thus, the court was fully apprised of Werner's arguments. In

64

this circumstance, there is no ground for holding that the award of prejudgment interest was an abuse of discretion.

## VIII.   It is premature for this Court to rule on jury instructions for a hypothetical second trial.

Werner asks this Court to hold that the district court erred in instructing the jury on a stand-alone failure-to-accommodate claim but does not seek reversal on this basis. *See* Br. at 51-52. The district court explained that it issued this instruction because "there was not a separate claim in this case, but there certainly was evidence, and the Court's obligation is to instruct on both the law and the evidence as it was presented." TR.,Vol.5, p.908. If this Court vacates and remands for a new trial, the district court should determine the appropriate jury instructions at that time based on the evidence presented. *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1062 (8th Cir. 1997) ("Motions to amend the pleadings to conform to the evidence under Rule 15(b) can be made at any time, even after judgment.").

65

## CONCLUSION

For the foregoing reasons, this Court should affirm the final

judgment.

Respectfully submitted,

KARLA GILBRIDE
General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

DARA S. SMITH
Assistant General Counsel

s/*Gail S. Coleman*
GAIL S. COLEMAN
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(202) 921-2920
gail.coleman@eeoc.gov

November 15, 2024

66

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,686 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Book Antiqua 14 point.

s/*Gail S. Coleman*
GAIL S. COLEMAN
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(202) 921-2920
gail.coleman@eeoc.gov

November 15, 2024

**CERTIFICATE THAT BRIEF IS VIRUS-FREE**

I certify that this brief has been scanned for viruses and is virus-free.

<div style="margin-left: 40%;">

s/*Gail S. Coleman*
GAIL S. COLEMAN
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(202) 921-2920
gail.coleman@eeoc.gov

</div>

November 15, 2024

## CERTIFICATE OF SERVICE

I certify that on this 15th day of November, 2024, I electronically filed the foregoing brief in PDF format with the Clerk of Court via the appellate CM/ECF system. I certify that all counsel of record are registered CM/ECF users, and service will be accomplished via the appellate CM/ECF system.

<div style="margin-left: 40%;">

s/*Gail S. Coleman*
GAIL S. COLEMAN
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(202) 921-2920
gail.coleman@eeoc.gov

</div>